W. A. MANDA, incorporated,

*v.*

DELAWARE, LACKAWANNA AND WESTERN RAILROAD COMPANY
et al.

[Submitted May 26th, 1915.   Decided June 15th, 1915.]

1. Where, in a suit against a railroad to compel it to provide a private crossing, a sewer was at such grade that for the construction of a crossing at a point proposed it would have to be lowered, the crossing could not be ordered at such point; since the municipality, not being a party, was not subject to the orders of the court.

2. Under *P. L. 1903 p. 659* § *26*, providing that it shall be the duty of every railroad company owning, leasing, or controlling any right of way for a railroad within the state, where such road intersects any private land, to provide and keep in repair suitable wagonways across such road, it is the duty of the court authorizing the construction of a private crossing in a landowner's suit therefor to arrange one suitable and convenient in view of the rights, duties and obligations both of the landowner and the road under all the facts.

3. In a suit against a railroad to compel the construction of a private crossing, evidence *Held* to show that a particular location would be the most practicable and convenient of all suggested.

4. All the work upon a private railroad crossing authorized by the court in a property owner's suit for its construction against a railroad *crossing his land must be done at the road's expense.*

5. Where the court, in a suit for a private crossing against a railroad, authorized such crossing, it should direct, from considerations of safety, that the crossing run from the level of the complainant's land on one side of the track to its level on the other in a straight line, and at right angles to the line of the track, and that its grade from the level of the land to that of the track should not exceed eight feet in the hundred.

6. Where the court, in a suit for a private crossing against a railroad intersecting land, authorizes the construction of a crossing at grade, it will require the road to install and maintain in good order an electric warning bell notifying the approach of a train at a distance of not less than one thousand two hundred feet.

On final hearing. On bill, answer, replication and proofs.

. *Mr. William H. Carey*, for the complainant.

*Mr. Maximilian M. Stallman*, for the defendants.

HOWELL, V. C.

The controversy in this case arises out of the elevation of the tracks of the Morris and Essex railroad, now under lease to the Delaware, Lackawanna and Western Railroad Company, through the village of South Orange, and the consequent destruction of a crossing at grade from the lands of the complainant on one side of the tracks of the railroad company to its lands on the other side thereof. The railway tracks at the point in question run in a northerly and southerly direction, the eastbound trains running northerly and the westbound trains running southerly. At the time the railroad was constructed the lands now owned by the complainant belonged to Samuel Brown; they descended to Pamela Tillou, from whom or from whose heirs the title was derived to W. A. Manda, who conveyed the same to the complainant corporation. The Tillou tract was divided by the railway line. About two acres thereof lie on the easterly side of the tracks and about six acres on the westerly side. The railway right of way over the Brown tract was acquired by condemnation, and during the life of the railroad company there have been three different points at which the railroad has constructed crossings for the owner of the said lands. The most northerly of these crossings was at Fourth street. This street was laid out and dedicated by Mrs. Tillou and appears to have been accepted as laid out, but it was laid out in both directions only to the railway line and not across it. This crossing may be called the northerly location. About two hundred and fifty feet south

of. Fourth street the railroad company constructed for the land-owner another grade crossing, which may be called the middle location; and later on, between the two, there was also constructed a crossing which, I understand, was meant to be a mere temporary affair, but which was in use at the time the track elevation interfered with all the methods of crossing the line. During these proceedings the railway company offered tentatively to furnish to the complainant a crossing at the extreme southerly boundary of his property, which may be called the southerly location, but which will not be considered, for the reason that I understand that by common consent a crossing at this point would be declined by both parties. There are, therefore, but two available and satisfactory locations for the crossing, and these are the northerly location and the middle location herein above referred to.

The northern location at Fourth street seems to me to be one that cannot be adopted. It was used for upwards of twenty years by the Tillous, and later by Manda and the complainant; it was reached from the east side of the railway line by a roadway constructed by the landowner to Fourth street, and its use was effectuated by traversing this short road its full length to Fourth street at its very junction with the railroad line, driving onto the street, turning at a right angle and crossing the railroad and driving off the railroad property onto the Tillou or Manda property lying on the west side of the railway line. This, it will be observed, involved the use of a small portion of Fourth street at the point where that street joins the railroad. It does not appear that the grade of Fourth street at this point has ever been established by the village. The maps and diagrams in evidence show that the street has been excavated somewhat in order to allow its use by the complainant and its predecessors in title, but this excavation, or grading, if it may be called such, is manifestly a piece of work not executed by the village because of its abruptness and lack of uniformity.

There is another observation to be made about this crossing. There is a storm water sewer running down Fourth street to the railroad; thence on the railroad's property underground to Third street; thence down Third street toward the outlet.

Through Fourth street this sewer is on village property; thereafter it is constructed on the railroad property, and its upper surface is now only a few inches beneath the surface of the ground. To construct a crossing at Fourth street would require that the grade of the bottom of the crossing should be about four feet below the present grade of the railroad, and therefore about four feet below the present grade of Fourth street at that point, this depression being necessary in order to provide adequate head room; and it is quite obvious that neither the grade of the street nor the position and location of the sewer could be changed in the slightest degree, except by agreement and arrangement with the village of South Orange. The village is not a party to this proceeding, and is not attempted to be made amenable to any decree that may be made herein, nor, indeed, do I see how this court could make any decree or give any directions whatever to the village in relation to this crossing for pure lack of jurisdiction over the municipality. These circumstances seem to me to render it impossible for the court to establish a crossing at Fourth street of the character required by the complainant for the proper conduct of his business and the use of his land therefor.

Let us next consider what has been called in the case the middle location. This is about two hundred and fifty feet south of Fourth street and is the point at which there was a private grade crossing for the complainant and his predecessors in title for many years. The location is satisfactory to both parties. They differ with regard to the kind of crossing which should be constructed, the railroad company being willing to construct a grade crossing at this point, and the landowner desiring an undercrossing. The elevation of the tracks at this point, when completed, will be about ten feet above the former level of the grade crossing. The complainant states that its business requires, and should have, eleven feet head room. This would require a lowering of the bottom of the crossing about three feet, making allowance for the depth of the rails, ties and other overhead construction. The complainant objects to the grade crossing at this point, on the grounds of difficulty and danger; it says that it would be difficult to carry its loaded wagons up the

grade to the new level of the tracks, and would be very dangerous because of the large number of passenger trains constantly passing at high rates of speed over the point in question. But it fully appears by the testimony that an eight per cent. grade could be easily constructed, and that a grade of eight feet in the hundred is not greater than many grades in public highways throughout the state which are not deemed steep; and that as to the danger of crossing, it is true that a large number of passenger trains at high rates of speed will use the tracks at this point; yet it appears that while a grade crossing at and near this point was used for many years by the complainant and its predecessors in title, no accident ever happened, nor was anybody ever injured or anybody's property destroyed by collision with a moving train or otherwise. There is, however, another important factor to be considered, and that is the cost of making an undercrossing at this point as compared with what appears to be the market value of the complainant's property lying east of the railway line. This was considered in *Speer* v. *Erie Railroad Co., 64 N. J. Eq. 601; 68 N. J. Eq. 615; 70 N. J. Eq. 318; 72 N. J. Eq. 411*, to be an important factor. From the evidence in the cause I conclude that the complainant's property, which lies east of the railway line, is worth not to exceed the sum of $7,000, while, according to the figures submitted by witnesses on both sides, the construction of an undergrade crossing at this point would cost very much more than that amount, in fact, nearly twice as much.

There is considerable evidence by expert railroad engineers as to this relative cost, but I find myself unable to compare them satisfactorily, for the reason that they proceed from different bases and upon different theories. The defendants estimate the expense of the construction of the undercrossing at this point to be about twelve thousand dollars. Their plan of doing the work, however, consists of completing the elevation and then constructing an undercrossing by means of a tunnel, or otherwise, through the embankment. They say that under the circumstances this is the only practicable way of doing it. The expert witnesses for the complainant, however, say that the cost would have been not one-half of the above amount if the crossing had been arranged

for and constructed as part of the whole work of track elevation. Yet they are obliged to admit that it would have been impossible to carry out their plan unless the railroad company could have occupied, during the period of elevation, a strip of land on the west side of the track to which it could temporarily shift its tracks, and to which it has no right or title. This obstacle might have been removed, possibly, but I am convinced that the only method of doing the work is the method that the railroad company has adopted, and even if their unit prices are somewhat exaggerated, as is claimed on the part of the complainant, there yet is a wide margin for the railroad company to claim that the expense of making the crossing would much exceed the value of the complainant's land on the east side of the tracks.

Another objection to a grade crossing at the so-called middle location consists in the fact that a large quantity of the complainant's land would necessarily be taken in building the slopes to the embankments necessary to be constructed in order to raise the grade of the roadways to the grade of the railway. This, however, I consider to be a small objection for this reason. The complainant is willing to take an undercrossing at this point. In order to reach it, it would be necessary to depress the road through the complainant's grounds to lead to the crossing. This would require slopes almost as great and occupying almost as much of the complainant's land as would the slopes of the embankment.

There is another matter which was largely discussed at the argument. This related to the direction in which the approaches to the grade crossing at the middle location should take. Two plans were submitted by the defendants. One a straight embankment, beginning on the complainant's land east of the railway and running to the railway line; thence over the crossing at grade, and thence in a direct continuation down the westerly embankment to reach the level of the complainant's gardens. The other plan contemplated approaching embankments running parallel with the line of the railway tracks. The latter strikes me as being awkward and dangerous, and if a grade crossing is to be constructed at that point, I see no reason why the first proposed

method should not furnish an adequate and reasonably safe and convenient crossing.

Again, any grade crossing at this point, or elsewhere, is objected to by the complainant upon the ground of danger. I have already remarked that during the many years that the complainant and his predecessors in title have been crossing the same railroad at about the same point at grade, no accident had ever happened to either persons or property.

There are about one hundred trains a day (from six A. M. to six P. M.) which pass this point in both directions, or, as was said at the argument, one train every twenty minutes, on the average. I think it quite well demonstrated that an approaching train from the north can be seen nearly two thousand feet away, and an approaching train from the south about eleven hundred feet. As an additional safeguard, a warning bell might be erected, and with this, I think that a crossing here could be made reasonably safe.

The railway companies claim that they are bound, if at all, to maintain the crossing at the point in question only so long as the lands now owned by the complainant on both sides of the line shall remain vested in the same person or corporation, and that in case the complainant should make sale or other disposition of its lands on one side of the track, their duty to maintain the crossing would at once cease. While there is nothing in the case which shows any immediate probability or possibility of such a division of the lands in question, it still remains a possibility, and, if the contention is correct, it ought to be considered by the court as a factor making weight in favor of a grade crossing at this point.

The charter of the Morris and Essex Railroad Company (*P. L. 1835 p. 29* § 9) provides that—

"It shall be the duty of the said company * * * where the said road shall intersect any farm or lands of any individual, to provide and keep in repair suitable wagon ways over and under said road, so that he may pass the same."

The present General Railroad law (*P. L. 1903 p. 659*) makes a somewhat similar provision which reads:

"It shall be the duty of every railroad company owning, leasing or controlling any right of way for a railroad within this state * * * where said railroad shall intersect any farm or land of any individual, to provide and keep in repair suitable and convenient wagon ways over, under and across said railroad."

I do not find any substantial difference between the two provisions, for surely a farm crossing which has been constructed either under or over the railway line must necessarily be said to have been constructed across said railroad.

We assume that complainant is entitled to some kind of a crossing, and, indeed, it is conceded by the defendant that the complainant is absolutely entitled to a grade crossing, and this they are willing to provide for it. Complainant, however, is not bound to accept any offer made by the railroad company, or even to negotiate for one, because, as owner of land on both sides of the railway, he has a right to a safe and convenient means of passing from one portion of his land to another portion thereof.

When a crossing is constructed under the authority of the court, it is the duty of the court to arrange a crossing that shall be suitable and convenient, considering the rights, duties and obligations of both the landowner and the companies. The proposition is very well stated in *Wademan* v. *Albany, &c., Railroad, 51 N. Y. 568,* found on the brief of the complainant. Beyond this the rule of law can hardly go, for every case must finally be disposed of on its own facts and on its own merits.

I am, therefore, of the opinion that, all things considered, the most practicable and convenient crossing would be at the middle location.

To make the crossing reasonably safe and convenient for the use of the complainant, the following directions should be observed:

1. All the work upon the crossing must be at the expense of the railway companies.

2. The approaches to the crossing must run from the level of the complainant's land on one side of the track to the level of the complainant's land on the other side of the track, in a straight line and at right angles to the line of the railway.

3. The grade from the level of the complainant's land to the level of the railway on either side of the track must not exceed eight feet in the hundred.

4. If the complainant desire it, the railway companies shall construct this crossing with a horizontal section next to the track on each side of the crossing long enough to accommodate a team and truck or an automobile truck.

5. The railway companies must install and maintain in good order an electric warning bell notifying the approach of a train at a distance of not less than twelve hundred feet.

These details of the construction are all that occur to me now. If there are others, they may be mentioned to me at the time of settling the order.